Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
Andrew J. Somers, #19078
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com
andrew@briansking.com

Attorneys for Plaintiff

## THE UNITED STATES DISTRICT COURT
### DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| IAN M., individually and on behalf of F.M. a minor,<br><br>    Plaintiff,<br><br>vs.<br><br>INDIANA UNIVERSITY HEALTH INC., INDIANA UNIVERSITY HEALTH PLANS, and the INDIANA UNIVERSITY HEALTH INC. HEALTH and WELFARE BENEFIT PLAN,<br><br>    Defendants. | COMPLAINT |

Plaintiff Ian M., individually and on behalf of F.M. a minor, through his undersigned

counsel, complains and alleges against Defendants Indiana University Health Inc. ("the Plan

Administrator"), Indiana University Health Plans, ("IUH") and the Indiana University Health

Inc. Health and Welfare Benefit Plan ("the Plan") as follows:

//

## PARTIES, JURISDICTION AND VENUE

1. Ian and F.M. are natural persons residing in Hamilton County, Indiana. Ian is F.M.'s father.

2. IUH is a subsidiary and affiliate of the Plan Administrator and was the third-party claims administrator, as well as the fiduciary under ERISA for the Plan during the treatment at issue in this case.

3. At all relevant times IUH acted as agent for the Plan and the Plan Administrator.

4. The Plan Administrator is the designated administrator for the Plan and operates an Indiana based nonprofit health system.

5. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). Ian was a participant in the Plan and F.M. was a beneficiary of the Plan at all relevant times.

6. F.M. received medical care and treatment at Change Academy Lake of the Ozarks ("CALO") beginning on March 26, 2021. CALO is a licensed treatment facility located in Missouri, which provides sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems. CALO specializes in the treatment of individuals with attachment related disorders.

7. IUH denied claims for payment of F.M.'s medical expenses in connection with his treatment at CALO.

8. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

9. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, and because IUH does, or

can reasonably be expected to conduct as a health insurance provider offering nationwide coverage, business in Utah.

10. In addition, the Plaintiff has been informed and reasonably believes that litigating the case outside of Utah will likely lead to substantially increased litigation costs he will be responsible to pay and that would not be incurred if venue of the case remains in Utah. Finally, given the sensitive nature of the medical treatment at issue, it is the Plaintiff's desire that the case be resolved in the State of Utah where it is more likely both Ian and F.M.'s privacy will be preserved.

11. The remedies the Plaintiff seeks under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), for an award of statutory damages against the Plan Administrator, and only the Plan Administrator, pursuant to 29 U.S.C. §1132(c) based on the failure of the Plan Administrator and its agents, to produce within 30 days documents under which the Plan was established or operated, an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### F.M.'s Developmental History and Medical Background

12. F.M. was born in a small village in the Democratic Republic of the Congo. When F.M. was a small child, his biological parents were involved in a boating accident and died by drowning. F.M. was blamed for this incident by other villagers and family members and

was claimed to be a "sorcerer" who was responsible for the death of his father and mother.

13. F.M. was severely mistreated and was eventually sent away from the village to an orphanage with his older brother. Upon arrival, F.M. showed significant signs of malnourishment and mistreatment, and was covered in scabs and parasites. F.M. was then kidnapped from the orphanage for a time by a man who attempted to extort money for his return.

14. F.M. was placed with a foster family and started demonstrating significant problems with attachment. He was often violent and would hit, kick, and bite others often. He would also steal from others and engaged in antisocial behaviors such as ripping up pictures that other children had drawn.

15. F.M. was adopted by Ian and was taken to Indiana around the time he was four years old. He continued to show erratic behaviors related to attachment and, on one occasion for instance, grabbed hold of an exterminator's legs and begged for the exterminator to take him home. Despite having food readily available, F.M. would also scavenge food out of the trash.

16. F.M. began receiving treatment from a psychologist at a facility which specialized in the treatment of attachment disorders. F.M. continued to steal from others and expressed hatred towards core aspects of his identity such as his name, skin color, and hair.

17. F.M. had issues with hyperactivity and had trouble focusing. He had significant anxiety and very low frustration tolerance. He was often tired throughout the day and was frequently frightened at night; a medical sleep evaluation found that he seldom slept for more than two hours at a time.

18. F.M. frequently showed a strong need to please others, but suffered from low self-worth, and was hypersensitive to ridicule and rejection. F.M. was homeschooled initially but to help correct his behaviors and provide additional socialization and support, he was sent to public school with the expectation that an individualized education plan would be put into place.

19. Due to a failure of the school's actions and the subsequent occurrence and complications of the Covid-19 pandemic, this education plan was never implemented. F.M.'s in-person school was cancelled and the high number of adjustments to his routine and sudden lack of in person friendships caused him significant attachment related anxiety.

20. Ian began receiving frequent complaints that F.M. would obsess over female peers, to the point that at least two of them had to be moved to a different class. F.M.'s school performance suffered. He often acted violently and erratically and, for instance, tackled and pinned his brother because F.M. didn't want his brother to watch him play a video game. F.M. began receiving additional treatment from a licensed counselor.

21. F.M. would punch walls at home and would physically attack his family members including his mother and sister. These outbursts required several police interventions and F.M. often hit so hard that his knuckles bled. During one such incident, F.M. was hospitalized for acute mental health intervention. F.M. was hospitalized again a few months later after a similar attack.

22. F.M. was released from the hospital in August of 2020 and then went to a residential treatment facility called Columbus Behavioral Center until February of 2021. F.M. was placed on "assault watch" on multiple occasions while there after attacking a peer. F.M.

was able to have a home visit but it was cut short due to his unsafe behaviors. F.M. started engaging in acts of self-harm and was placed on self-harm watch at the facility.

23. F.M. continued to behave inappropriately toward girls while in treatment. Columbus Behavioral Center stated that F.M. would not benefit further by staying there and he was discharged in February of 2021.

24. F.M. continued to act out and behave erratically. On one occasion, for instance, when he learned that a friend might be moving in the future, he became so dysregulated that he assaulted his mother and the police had to be called.

25. F.M. became increasingly rebellious and stated that he would no longer follow any rules he didn't like and often threatened his parents with physical harm. F.M. was then admitted to CALO.

### CALO

26. F.M. was admitted to CALO on March 26, 2021.

27. In a letter dated June 25, 2021, IUH denied payment for F.M.'s treatment at CALO beginning on June 24, 2021. The letter gave the following justification for the denial:

> Based on the provided guideline, the requested service of behavioral health residential treatment from 06/24/2021 through 07/01/2021 was not found to be medically necessary. The clinical information provided does not indicate that the service requested was medically necessary or was likely to be successful in treating the patient's symptoms.
>
> The clinical information reviewed indicates that the patient had no significant ongoing symptoms that required residential treatment level of care as of 06/24/2021. The patient was not reported to have any suicidal or homicidal ideations or deemed to be at risk of harm to self or others. There was no indication of the patient continued to be [sic] at danger of harm to self or others. There was no indication that the patient had any significant ongoing behavioral health symptoms that required a 24-hour structured setting for continued treatment. He was not reported to have any symptoms suggestive of psychosis including hallucinations, delusions, or paranoia. He was not reported to have any significant symptoms suggestive of mania or hypomania. He was noted to have

intermittent episodes of agitation, aggression and impulsive behaviors. However, he was not reported to have exhibited any significant and persistent agitation or aggressive behaviors that represented a change from his baseline.

The patient was not reported to have any significant adverse effects from his medications. He had no significant ongoing medical problems that could potentially interfere with his recovery. The patient was not reported to have any significant functional impairments including activities of daily living or self-care that represented a change from baseline. There was no indication of the patient required [sic] round-the-clock monitoring with medical and nursing care available. The clinical information reviewed indicates that the patient may have been treated safely in a less restrictive setting and lower level of care such as a partial hospitalization program. Therefore, based on the provided guidelines, continued residential treatment level of care from 06/24/2021 to 07/01/2021 was not found to be medically necessary.

If the member or the doctor wishes to receive a copy of IU Health Plans' clinical criteria or benefit provision on which this decision is based, copies will be sent upon request.

28. On December 15, 2021, Ian submitted an appeal of the denial of payment for F.M.'s treatment at CALO. Ian pointed out that IUH had only listed June 24, 2021, through July 1, 2021, as the dates of service which had been reviewed, but he wrote that he was appealing all denied dates of service through December 31, 2021.

29. Ian wrote that he was entitled to certain protections under ERISA during the appeal process, including a full, fair, and thorough review conducted by appropriately qualified reviewers whose identities were clearly disclosed, which took into account all of the information he provided, and which gave him the specific reasons for the adverse determination, referenced the specific plan provisions on which the denial was based, and which gave him the information necessary to perfect the claim.

30. He asked that the reviewer have experience treating individuals with F.M.'s diagnoses and that they be trained in the details of MHPAEA to respond to his allegations concerning a violation of the statute.

31. Ian contended that IUH had improperly assessed F.M.'s treatment needs by failing to utilize criteria intended to evaluate children and adolescents. Further, he argued that IUH was failing to abide by generally accepted standards of practice and had, for instance, utilized acute level requirements to evaluate the medical necessity of treatment in a sub-acute level of care.

32. He argued that IUH imposed requirements which were irrelevant to the treatment of F.M.'s condition, while also ignoring factors which were relevant. He wrote that F.M. required treatment in an environment that was not only safe but also effective and that F.M. was at considerable risk of regression if he was prematurely sent to a lower level of care.

33. Ian argued that F.M.'s treatment should be based on his specific needs and be rendered in accordance with generally accepted standards of medical practice.

34. He expressed concern that IUH's denial was a violation of MHPAEA. He wrote that MHPAEA compelled insurers to ensure that benefits for mental health services were offered at parity with benefits for analogous medical or surgical services. He identified skilled nursing, subacute rehabilitation, and inpatient hospice care as some of the medical or surgical analogues to the treatment F.M. received.

35. Ian contended that IUH was imposing acute level requirements such as being suicidal, homicidal, psychotic, or a danger to self or others to improperly review the medical necessity of a sub-acute level of care. He wrote that IUH did not do this for analogous medical or surgical care and asked that if he was wrong for IUH to explain why he was mistaken in detail using supporting documentation. He also asked IUH to perform an

analysis on the Plan to ensure that the Plan was compliant with MHPAEA and asked for physical copies of the results of this analysis.

36. Ian wrote that CALO was selected to treat F.M. specifically because of its success with treating individuals suffering from attachment related disorders and that there were no facilities available locally with the capability to effectively treat these conditions.

37. Ian included letters of medical necessity with the appeal. In a letter dated March 22, 2021, Kris Berryman, LCSW, wrote in part:

> I am writing on behalf of [F.M.], DOB [redacted] and his family. I highly recommend that [F.M.] participate in a residential facility setting that specializes in attachment disorders. My recommendation is based upon recognizing the severity of [F.M.]'s intense mental health needs, mental health concerns for [F.M.]'s immediate family members, and safety matters for the entire family system. I ask that you please consider a residential placement that will be able to meet his needs.

38. John Delaney, MD, wrote in a letter dated September 1, 2020:

> I currently see and treat [F.M.] for Disruptive Mood Dysregulation Disorder, Reactive Attachment Disorder, Anxiety, and Attention-deficit Hyperactivity Disorder. Due to multiple acute inpatient hospitalizations due to symptom exacerbations, it is my recommendation that he be in residential placement for further stabilization of his symptoms.

39. Shilpa Guggali, MD, wrote in part in a letter dated March 16, 2021:

> [F.M.] (DOB: [redacted]) was admitted to the youth behavioral care unit at Community Hospital North on March 10th, 2021 to ensure his safety and the safety of those around him. [F.M.] has had numerous hospitalizations and was most recently at Columbus Behavioral Health.
>
> Despite these acute care hospitalizations, residential placements and outpatient services via Choices, [F.M.] has been unable to make any sustainable therapeutic gains. It is my recommendation that [F.M.] be placed in a residential treatment facility to receive consistent and structured care that would foster optimal functioning in school, home, and in the community.

40. In a letter dated August 17, 2021, Rachel Finley, BA, Holly McFadden, LCSW, and Nancy Fisher, LCSW, with the Children's Bureau Post-Adoption Services wrote in part:

[F.M.] and his family have been served by the Children's Bureau Post- Adoption Services (PAS) program since July of 2020. These services have been focused on providing referrals to community resources to promote and improve family functioning, as well as providing ongoing parent education, support and advocacy. Over the last year PAS has provided a variety of referrals, both while [F.M.] was in the home and in residential treatment. …

It remains the recommendation of the PAS program that [F.M.] remain in residential treatment with Calo, as a behavior modification program has proven to be ineffective. Additionally, [F.M.]'s needs require a level of intervention above intensive community-based services. It is the opinion of the PAS program that his reunification prior to completing his current treatment programming would be ill-advised and potentially unsafe for himself and his family.

41. Jane Yip, Ph.D. BCBA, wrote in part in an undated letter:

This is a letter of appeal on behalf of [F.M.]. He is 11 years old and has done a brainmapping test at our facility. The results showed that [F.M.] showed signs of severe anxiety to the level of panic attacks, he is obsessive compulsive, is easily confused, does not receive verbal communication well, and is delayed developmentally to a significant level. In addition, he is hypervigilant or highly avoidant of life and is prepared to defend himself from having to participate in it-hence displaying the symptoms of PTSD. He has been affected developmentally and is behind his peers in developmental milestone to a severe level. He is also cognitively delayed, and therefore will need instructions presented in a way he can comprehend and preferably residential stay.

There is a possibility of prenatal exposure to alcohol and he could not be contained easily when he gets aggressive which he has often. …

He exhibits behaviors that are concerning suggestive of severe dysregulation. My recommendation is that the Court and other relevant authorities consider [F.M.]'s long-term well-being and continue his current residential arrangement.

42. Ian wrote that it was the clinical opinion of all F.M.'s treating providers that residential treatment was necessary and appropriate. He expressed his concern that IUH would attempt to supersede the opinions of the clinical professional who had worked with F.M. closely on a firsthand basis and actively witnessed the deterioration of his condition.

43. Ian argued that reactive attachment disorder was a complex psychiatric disorder which was an exceptionally difficult condition to treat and that the research showed that there

"are no simple solutions or magic answers" to treat the condition, and it often required very specific treatment in a specialized residential program.

44. He included copies of F.M.'s medical records at CALO. These records showed that F.M. continued to struggle with issues such as: anxiety, medication refusal, physically assaulting others which sometimes required staff intervention and physical restraint, suicidal ideation, homicidal ideation, aggression, hoarding food, bullying others, refusing to follow direction, low self-control, punching walls and other objects, refusal to maintain hygiene, self-isolation, hypervigilance, low frustration tolerance, threats to others such as "I'm going to rape you," threats to animals, and compulsive behaviors.

45. Ian wrote that contrary to IUH's claim, F.M. did satisfy all the necessary requirements for treatment to be approved. He contended that IUH made unsupported claims such as a statement that F.M.'s treatment was not likely to be successful, without providing any evidence that this was the case. Further, IUH made statements like there being "no significant ongoing symptoms" despite the medical records directly contradicting this and F.M. clearly and regularly exhibiting unsafe behaviors.

46. Ian pointed out that the reviewer appeared to have ignored the information in F.M.'s clinical records, and had made statements such as F.M. not being at risk of harm to self or others, which was not only an inappropriate metric to evaluate the necessity of residential care, but was also "simply untrue" and F.M. "barely had a week go by at CALO without an incident with aggression, violence, verbal threats, property damage, or self-harm."

47. He wrote that other treatment interventions had been ineffective. He contended that F.M. easily met the MCG criteria IUH alleged to have used, and his treatment should have

been deemed medically necessary. He also alleged that F.M. clearly did not meet the applicable discharge criteria.

48. He pointed to a provision in the summary plan description which allowed the Plan to conduct an in-person examination if there was any question of the medical necessity of treatment. Ian invited IUH to take advantage of this provision and observe F.M. directly if it believed F.M.'s treatment was unnecessary.

49. Ian also noted that a concurrent medical necessity review had been conducted on June 16, 2021, and that review found that F.M.'s residential treatment was necessary. He included a copy of this review as an exhibit to the appeal.

50. In addition Ian asked to be provided with a copy of all documents under which the Plan was operated, including all governing plan documents, the summary plan description, any insurance policies in place for the benefits he was seeking, any administrative service agreements that existed, any clinical guidelines or medical necessity criteria utilized in the determination (along with their medical or surgical equivalents, whether or not these were used), together with any reports or opinions regarding the claim from any physician or other professional, along with their names, qualifications, and denial rates (collectively the "Plan Documents").

51. In a letter dated February 22, 2022, IUH upheld the denial of payment for F.M.'s treatment under the justification that:

> You submitted an appeal on behalf of your dependent, for Residential stay at Change Academy at Lake of the Ozarks from June 24, 2021, to December 31, 2021. The appeal for this request has been denied. This decision is based on Milliman Care Guidelines 24th Edition Other Psychiatric Disorders: Residential Care ORG: B-010-RES (BHG) and Anxiety Disorders: Residential Care ORG: B-002-RES (BHG). The clinical information submitted did show that discharge criteria was met (No ongoing violence or physical aggression that required restraints or seclusion and absence of thoughts of suicide or homicide).

The clinical information submitted also did not show significant improvement from admission date. The alternative level of care recommended is outpatient treatment in a Group Home setting. Please follow up with the doctor to discuss alternative care options.

52. On June 13, 2022, Ian asked for the denial of payment for F.M.'s treatment to be evaluated by an external review agency. F.M. asked that the reviewer be appropriately qualified and asked them to carefully review the significant clinical evidence he provided.

53. Ian expressed concern that IUH appeared to have utilized criteria which were both outdated and appeared not to be the correct criteria to utilize for a child suffering from reactive attachment disorder.

54. He voiced his frustration that IUH had failed to reference any of the clinical evidence he had included with his appeal. He again asked the reviewer to directly reference the specific clinical evidence used to inform their decision.

55. Ian included updated copies of F.M.'s medical records with the appeal. He wrote that while F.M. had made progress, reactive attachment disorder was a particularly difficult condition to treat and F.M. needed long-term residential care to see any true gains.

56. He contended that F.M. did not meet the requirements listed in the MCG guidelines discharge criteria, nor had IUH offered any proof that the discharge criteria were satisfied.

57. He noted that F.M. continued to struggle with concerning behaviors such as suicidal and homicidal ideation, significant aggression, self-harming, physical confrontations and assaults against staff and peers, and other behaviors which clearly indicated the necessity of care at the residential level.

58. He wrote that F.M. was at CALO to receive safe, effective, and necessary treatment for F.M. to learn healthy coping mechanisms and implement them in his everyday life. Ian argued that there was no other effective treatment option. He again asked for a copy of the Plan Documents.

59. In a letter dated July 8, 2022, the external review agency upheld the denial of payment for F.M.'s treatment. The letter gave the following justification for upholding the denial:

> The Maximus physician consultant noted that the member was admitted on 3/26/21 and he presented with persistent anger, irritability, aggression, impulsivity, and mood dysphoria. The Maximus physician consultant noted that the member was given medication which included buspirone, trazodone, Depakote, methylphenidate, Prozac, and Seroquel. The Maximus physician consultant indicated that the member denied any suicidal thoughts or homicidal ideation. The Maximus physician consultant also indicated that the member did not have any abnormal thoughts or psychosis including auditory or visual hallucinations. The Maximus physician consultant noted that the member had no behaviors or medical issues which required 24 hour supervision/observation. The Maximus physician consultant also noted the member was not observed to be a threat to himself or others.
> The Maximus physician consultant explained that in a case such as this one, an evidence-based, objective, instrument such as the American Association of Community Psychiatrists Level of Care Utilization System (LOCUS) can be used in determining the necessary level of care. The Maximus physician consultant noted that in terms of Risk of Harm on this system, the records support a score of 1 due to a lack of current suicidal ideation and no self-harming behaviors. The Maximus physician consultant also noted that regarding Functional Status, the records support a score of 1 due to minimal problems with comorbidity. The Maximus physician consultant indicated that in terms of Medical, Addictive and Psychiatric Comorbidity, the records support a score of 1 due to overall medical stability. The Maximus physician consultant also indicated that in terms of Level of Stress of the Recovery Environment, the records support a score of 1 due to a stable living situation. The Maximus physician consultant further indicated regarding the Level of Support for the Recovery Environment, the records support a score of 1 due to family support and availability of treatment resources, but also some difficulty in relationships with his family members. The Maximus physician consultant explained that regarding Treatment and Recovery History, the records support a score of 1 due to success at the residential treatment center level of care. The Maximus physician consultant noted that in terms of Engagement and Recovery Status, the records support a score of 1 due to cooperation in treatment and insight into his need for treatment along with insight into his treatment needs. The Maximus physician consultant explained that therefore, the member had a

composite score of $7^1$ during the period at issue in this appeal, which would correlate with treatment in a community-based outpatient clinic setting.

60. As he had yet to receive a response to his request for documentation, Ian made one last attempt to procure the documents to which he was entitled by sending a letter directly to the Plan Administrator on November 7, 2023. He asked to be provided with:

> • Disclosure of the identities of all individuals with clinical or medical expertise who evaluated the treatment for my son, [F.M.], at Change Academy at Lake of the Ozarks, copies of those individuals' curriculum vitae, copies of any memoranda, emails, reports, or other documents reflecting the rationale of the reviewers in denying coverage for [F.M.]'s claim;
> • A complete copy of both the medical necessity criteria utilized by to Indiana University Health Plans in determining that [F.M.]'s treatment was not medically necessary and that treatment for him at a lower level of care was appropriate;
> • A complete copy of the medical necessity criteria utilized by the Plan for skilled nursing facilities, sub-acute inpatient rehabilitation treatment, and inpatient hospice treatment. This is necessary to allow me to carry out an evaluation of whether the Plan has complied with the requirements of the federal Mental Health Parity and Addiction Equity Act;
> • Copies of documents identifying the self-compliance analysis the Plan and to Indiana University Health Plans have carried out to determine the extent to which they are complying with the federal Mental Health Parity and Addiction Equity Act.
> • Complete copies of any and all internal records compiled by to Indiana University Health Plans and Indiana University Health, Inc. in connection with [F.M.]'s claim including, but not limited to, telephone logs, memoranda, notes, emails, correspondence, or any other communications;
> • A copy of the summary plan description, master plan document, certificate of insurance, insurance policy, and any other document under which [F.M.]'s insurance plan is operated;
> • Copies of any and all administrative service agreements, contracts or other documents which described and defined the relationship, rights and obligations of and between you, the plan administrator, and to Indiana University Health Plans; and

---

[1] The reviewer assigned F.M. a score of "1" in every single metric, the absolute lowest score possible (as a score of 0 in any area is not attainable). This suggests that either F.M.'s issues were so minor that not a single factor suggested treatment at anything but the very lowest level of care was necessary, and that F.M. was performing similarly to a child with zero mental health or behavioral issues, or the composite score of 7 stands for the proposition that the reviewer's assessment was not appropriately full, fair, or thorough. The reviewers scores are implausible.

• Copies of any and all documents outlining the level of accreditation required for residential treatment programs;

• Copies of any and all documents showing whether analogous levels of care to residential treatment programs also require these levels of accreditation; and

• Copies of documents identifying the process, strategies, evidentiary standards, or other factors the Plan used to determine that the treatment at Change Academy at Lake of the Ozarks was experimental and investigational.

• Copies of documents identifying the processes, strategies, evidentiary standards, and other factors used to determine whether treatment at sub-acute inpatient programs for medical or surgical treatment is experimental and investigational.

• Copies of documents identifying the processes, strategies, evidentiary standards, and other factors used to apply a nonquantitative treatment limitation with respect to medical/surgical benefits and mental health or substance use disorder benefits under the plan.

61. Ian received a response letter dated January 4, 2024, stating that his request had been received and that counsel for Defendants was researching the request. Despite this, Plaintiff has yet to receive the documentation he requested.

62. The Plaintiff exhausted his pre-litigation appeal obligations under the terms of the Plan and ERISA.

63. The denial of benefits for F.M.'s treatment was a breach of contract and caused Ian to incur medical expenses that should have been paid by the Plan in an amount totaling over $300,000.

## FIRST CAUSE OF ACTION

### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

64. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as IUH, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

65. IUH and the Plan failed to provide coverage for F.M.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for

medically necessary treatment of mental health and substance use disorders.

66. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

67. The denial letters produced by IUH do little to elucidate whether IUH conducted a meaningful analysis of the plaintiff's appeals or whether it provided him with the "full and fair review" to which he is entitled. IUH failed to substantively respond to the issues presented in Ian's appeals and did not meaningfully address the arguments or concerns that the Plaintiff raised during the appeals process.

68. In fact, the denial letters referenced above appear to often directly contradict the information Ian provided and make assertions which are plainly refuted by the clinical records submitted with the appeals.

69. IUH and the agents of the Plan breached their fiduciary duties to F.M. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in F.M.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of F.M.'s claims.

70. The actions of IUH and the Plan in failing to provide coverage for F.M.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

71. While the presentation of alternative or potentially inconsistent claims in the manner that Plaintiffs state in their first, second, and third causes of action is specifically anticipated

and allowed under F.R.Civ.P. 8, Plaintiffs contend they are entitled to relief and appropriate remedies under each cause of action.

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

72. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of IUH's fiduciary duties.

73. MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

74. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

75. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

76. The medical necessity criteria used by IUH for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the medical necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

77. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for F.M.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

78. When IUH and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice.

79. IUH and the Plan evaluated F.M.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

80. As an example of disparate application of medical necessity criteria between medical/surgical and mental health treatment, IUH's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that F.M. received.

81. IUH's improper use of acute inpatient medical necessity criteria is revealed in the statements in IUH's denial letters such as "[t]he patient was not reported to have any suicidal or homicidal ideations or deemed to be at risk of harm to self or others" or "[t]he clinical information submitted did show that discharge criteria was met (No ongoing

violence or physical aggression that required restraints or seclusion and absence of thoughts of suicide or homicide)."

82. Not only is this improper use of acute inpatient criteria a nonquantitative treatment limitation that cannot permissibly be applied to evaluate the sub-acute level of care that F.M. received, but the statements themselves are simply not true. F.M. did exhibit homicidal and suicidal ideation, did engage in acts of self-harm, did physically attack others, and was placed in restraining holds.

83. This information was present in the medical records included with the appeal, not only in accompanying exhibits, but in the body of the appeal itself in excerpts directly chosen to demonstrate the medical necessity of F.M.'s treatment.

84. Further, IUH stated that F.M. was at his baseline and that there was no indication that his treatment was "likely to be successful." Plaintiffs are aware of no similar requirement or expectation for medical/surgical care and IUH refused to elaborate on how it had reached this conclusion.

85. In addition, the level of care applied by IUH failed to take into consideration the patient's safety if he returned to a home environment, as well as the risk of decline or relapse if less intensive care than what was medically necessary was provided.

86. Generally accepted standards of medical practice for medical and surgical rehabilitation under the Plan take into consideration safety issues and considerations of preventing decline or relapse when admission into an intermediate care facility, such as a skilled nursing or rehabilitation facility, is approved.

87. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and IUH, as written or in

operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

88. IUH and the Plan did not produce the documents the Plaintiff requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any substantive capacity the Plaintiff's allegations that IUH and the Plan were not in compliance with MHPAEA.

89. In fact, despite Ian's request that IUH and the Plan conduct a parity compliance analysis and despite the direction from the Department of Labor that ERISA plan and claim administrators perform parity compliance analyses, IUH and the Plan have not provided Ian with any information about whether they have carried out any parity compliance analysis and, to the extent that any such analysis was performed, IUH and the Plan have not provided Ian with any information about the results of this analysis.

90. The violations of MHPAEA by IUH and the Plan are breaches of fiduciary duty and also give the Plaintiff the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendants violate MHPAEA;

(b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiff as make-whole relief for his loss;

(g) An order equitably estopping the Defendants from denying the Plaintiff's claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiff for his loss arising out of the Defendants' violation of MHPAEA.

**THIRD CAUSE OF ACTION**

**(Request for Statutory Penalties Under 29 U.S.C. §1132(a)(1)(A) and (c))**

91. IUH, acting as agent for the Plan Administrator, is obligated to provide to participants and beneficiaries of the Plan within 30 days after request, documents under which the Plan was established or operated, including but not limited to any administrative service agreements between the Plan and IUH, the medical necessity criteria for mental health and substance abuse and medical necessity criteria for skilled nursing and rehabilitation facilities.

92. In spite of Ian's requests during the appeal process for IUH to produce the documents under which the Plan was operated, IUH repeatedly failed to produce to the Plaintiff the documents under which the Plan was operated, including but not limited to any administrative service agreements between the Plan and IUH, the medical necessity

criteria for mental health and substance abuse and medical necessity criteria for skilled nursing and rehabilitation facility treatment within 30 days after they had been requested.

93. After IUH repeatedly failed to provide these materials, Ian sent one final letter dated November 7, 2023, to both IUH and the Plan Administrator again requesting the documents which he was statutorily entitled to receive upon request. Ian received a response promising investigation of his request, but IUH and the Plan Administrator have yet to comply with Ian's request for documents.

94. The failure of the Plan Administrator and its agent IUH, to produce the documents under which the Plan was operated, as requested by the Plaintiff, within 30 days of Ian's request for ERISA documents, provides the factual and legal basis under 29 U.S.C. §1132(a)(1)(A) and (c) for this Court to impose statutory penalties up to $110 per day on the Plan Administrator, and only the Plan Administrator, from 30 days from the date of each of these letters to the date of the production of the requested documents.

95. In addition, Plaintiff is entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiff seeks relief as follows:

1. Judgment in the total amount that is owed for F.M.'s medically necessary treatment at CALO under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiff's Second Cause of Action;

3. For an award of statutory penalties of up to $110 a day against the Plan Administrator, and only the Plan Administrator, after the first 30 days for each

instance of the Plan Administrator and its agent IUH's failure or refusal to fulfill their duties, to provide the Plaintiff with the documents he had requested;

4.      Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

5.      For such further relief as the Court deems just and proper.

DATED this 25th day of March, 2024.

By ____s/ Brian S. King_____
        Brian S. King
        Attorney for Plaintiff

County of Plaintiff's Residence:
Hamilton County, Indiana